William A. CARTER, Appellant,

v.

Donald R. BARCLAY, Appellee.

No. 8198.

Court of Civil Appeals of Texas,
Amarillo.

Jan. 31, 1972.

Addendum Feb. 14, 1972.

Rehearing Denied Feb. 28, 1972.

Walter P. Wolfram, Amarillo, for appellant.

Fike & Hunter, William Hunter, Dalhart, for appellee.

ELLIS, Chief Justice.

This appeal results from a trial court judgment quieting title in plaintiff-appellee to a certain tract of land and awarding plaintiff actual and exemplary damages against the defendant-appellant for trespass on the land in controversy.

After a series of negotiations extending over a period of several months, on April 23, 1970, the appellant, William A. Carter, entered into a contract to purchase 35.8 acres of land from Mrs. Betty Barclay, mother of Donald R. Barclay, appellee herein, and Eugene Barclay, uncle of appellee and administrator of the Estate of appellee's deceased father, Ray A. Barclay. Under the terms of this contract, the purchaser, Carter, was required to sell and convey a tract containing a net of 6.065 acres (hereinafter sometimes called 6 acre tract) out of the 35.8 acre tract to the appellee, Donald R. Barclay. Pursuant to such requirement, a contract was entered into between Carter, a 37 year old man with considerable business experience, as seller, and Donald R. Barclay, 22 years of age, as purchaser, for the sale and conveyance of the tract containing 6.065 acres. This contract provided that Barclay would purchase the land at the rate of $500.00 per acre and that the consideration would be paid in cash at the time of closing. It was understood that the two transactions would be closed simultaneously. Prior to the closing of the transactions, young Barclay arranged to borrow the sum of $3,250.00 from the First State Bank at Vega, Texas, upon presenting his note co-signed by his uncle, Eugene Barclay. Appellee was given a bank note to be executed to secure the loan.

On Friday, May 8, 1970, after bank business hours, all of the parties to the two above mentioned contracts met for the closing of the transactions. At or about the time of the closing, appellee's uncle, Eugene Barclay, co-signed the note with his nephew, Donald R. Barclay, although there is some conflict in the testimony as to whether Carter was aware of the arrangement for the uncle's co-signing of the note. On this occasion Carter received deeds executed by Eugene Barclay, administrator of the Estate of Ray A. Barclay, deceased, and by Betty Barclay, conveying together the entire 35.8 acres, and he delivered to them separate checks representing the consideration. Also, upon the closing of this transaction, Donald R. Barclay gave a check to Carter, drawn on the First State Bank of Vega, Texas, in the sum of $3,032.50, the purchase price of the approximately 6 acre tract of land, and Carter delivered a deed to Barclay reciting a cash consideration. It was Barclay's testimony that Carter agreed to meet him (Barclay) at 8:00 a. m., Monday, May 11, 1970, for the purpose of filing their respective deeds in the courthouse at Hereford and then they would proceed to the First State Bank at Vega together so that Barclay could exchange his signed and co-signed note for cash to pay Carter's check. Carter testified that his understanding concerning their going to the bank on May 11 was that "(W)e were to meet on the morning of the 11th, Monday morning, and get the check cashed and get the papers recorded."

On Monday, May 11, 1970, at 8:00 a. m., when Carter had not arrived at Barclay's home near Vega, Texas—the agreed upon

meeting place—Barclay went to the courthouse in Hereford and there recorded his deed. When Barclay arrived at the courthouse, Carter's deed to the 35.8 acre tract had already been recorded. Carter testified that he had sent a third party to Hereford to file the deed before 8:00 a. m. At approximately 8:10 a. m., Carter arrived at the Barclay home, after Barclay had departed for Hereford. Upon finding that Barclay was not at home, Carter went promptly to the First State Bank in Vega, Texas, and presented Barclay's check for payment.

Bank officials explained to Carter that the note had not been returned to the bank co-signed and that therefore Barclay's account had not been credited with the sum of the note. However, the bank president, Raymond Thompson, testified that he assured Carter that his bank would call him when the note was returned and the funds credited to the account so that he could receive his payment on the check. According to Thompson's testimony, Carter at first seemed agreeable to the arrangement whereby Thompson would contact him by telephone when the note arrived, but then an hour or two later Carter returned and had one of the bank vice presidents stamp "Insufficient Funds" on the check. (This account conflicts with Carter's testimony that upon being apprised of the situation, he immediately went to a teller and got the check so stamped, and that Thompson told him that "if and when" Eugene Barclay co-signed the note, it would be paid.) Carter than traveled to Amarillo to the office of his attorney. At 3:00 p. m. on the same day, Carter filed an instrument entitled "Resolution In Cancellation of Warranty Deed and Cancellation of Contract to Convey Realty" in the Deed Records of Deaf Smith County, Texas. The instrument alleged failure of consideration and purported to cancel the warranty deed delivered to Barclay and to terminate the Contract of Sale. That evening, after Barclay learned of the presentation and nonpayment of the check, he went to Carter's home and offered to go with him the next morning and get the check paid, but Carter said he had other things to do and didn't have time.

On the morning of May 12, 1970, Barclay went to the bank and deposited the money and the bank president, Mr. Thompson, called Carter's home. Upon being advised by Carter's wife that Mr. Carter was not at home, Thompson requested that she ask Carter to call the bank and to inform him that the Barclay check was good. Carter did not return the call.

On May 13 or 14, 1970, Carter came to Barclay's home and tried to renegotiate the contract, seeking more highway frontage for his (Carter's) property, a removal of restrictions in the contract, and a commitment from Barclay to pay one-half of the cost of a fence between their properties. On this occasion, Barclay advised Carter that he had deposited the money to cover the check. The attempt at renegotiation was unsuccessful and Carter told Barclay to see his lawyer with regard to any further negotiations. On May 15, 1970, Barclay purchased a cashier's check at his bank in sufficient sum to cover the purchase price of the property, and the check was presented to Carter's designated attorney on the same day. The attorney refused the check and advised Barclay that he was not authorized to accept it.

In late May or early June, 1970, while Barclay and Carter were both claiming title to the disputed acreage, Carter removed Barclay's electric fence and posts and plowed the land. Barclay admitted that at the time of Carter's entering on the land and plowing, the wheat on the land was "grazed out," the livestock had already been moved, that the fence and fence posts were rolled up by Carter so that they could be used again and that the land proper was not diminished in value by the actions of Carter. At a later date, Carter again plowed the land. It was Barclay's testimony that he had intended to allow the grazing pasture to grow back and then again use the land for grazing purposes, but that

this plan could not be accomplished because of Carter's plowing of the land which destroyed the wheat to be pastured. Carter's testimony was to the effect that his plowing of the acreage was to prevent non-compliance on his part with respect to requirements concerning planted and diverted acreage under his overall government allotment program when the tract in question was considered as combined with Carter's other land.

On July 24, 1970, Barclay tendered the full amount of the consideration in cash to Carter who refused to accept it. On September 4, 1970, Barclay filed suit against Carter. In his amended petition, he sought judgment (1) removing cloud on his title to the tract of land; (2) actual and exemplary damages; and (3) attorney fees and injunctive relief against Carter. Carter answered the suit and filed a counterclaim seeking cancellation of the deed, actual and exemplary damages, together with attorney fees.

A jury was duly empanelled and evidence was submitted. The trial court, however, withdrew all issues from jury consideration except those pertaining to Barclay's claims for actual and exemplary damages against Carter.

The trial judge made findings as follows: (1) that the plaintiff has made a lawful tender of the purchase price of the property to the defendant, (2) that the plaintiff is ready, willing and able to pay said amount, (3) but that defendant has refused and continues to refuse such sum, and (4) that the plaintiff is entitled to title and possession. The jury found that $55 would reasonably compensate Barclay for damages by reason of the entry by the defendant Carter upon the property and the plowing of same, that such entry was prompted by malice, and that Barclay was entitled to $1,500 in exemplary damages.

Judgment was entered quieting title to the land in Barclay and awarding him actual and exemplary damages of $55 and $1,500, respectively. From this judgment appellant has brought his appeal predicated upon ten assignments of error. In his brief, these points are discussed in three groups.

In the first group, appellant includes his points of error one, two and five. In the first point, he complains of the trial court's failure to submit defendant's tendered special issues seeking findings by the jury that Barclay defrauded defendant by representing to him that his check was good when presented in return for the warranty deed to the land in question and that Carter relied upon such representation when he delivered the deed to Barclay. In the second point, the appellant insists that there is no evidence to support the trial court's judgment placing title to the land in the appellee Barclay. In the fifth point, appellant contends that the trial court erred in excluding from evidence the contract of sale between the parties.

An examination of the appellant's brief with respect to points one, two and five indicates that these points should be considered primarily to the extent that they are related to the question of fraud as a basis for his claim of the right of recission. The appellant complained specifically that the trial court failed to consider his claim as one grounded upon fraud, but, instead, dealt with the claim as one based upon failure of consideration. Regarding appellant's first point wherein he complains of the trial court's failure to submit the appellant's tendered issues seeking to establish fraudulent representations by Barclay that his check was good and appellant's reliance thereon in delivering the deed, it is initially noted that answers to none of such requested issues would serve to establish damage to Carter by reason of Barclay's alleged fraudulent misrepresentation. No issues covering injury resulting from such alleged misrepresentation were included among his requested issues. The only damage issues submitted by Carter related to alleged damages sustained by him as a result of Barclay's alleged illegal entry on the property.

One of the essential elements of a fraudulent misrepresentation justifying relief by recission is resulting loss, damage or injury to the party deceived. Russell v. Industrial Transportation Company, 113 Tex. 441, 258 S.W. 462 (1924); Booth v. Chadwick, 154 S.W.2d 268 (Tex.Civ.App. —Galveston 1941, writ ref'd, w. o. m.); Wilkirson v. Thompson, 104 S.W.2d 1115 (Tex.Civ.App.—Waco 1937, no writ). Thus, it was not error for the trial court to refuse defendant's tendered issues, for affirmative answers thereto should not have affected the disposition of this case. An examination of the evidence indicates that the appellee did not act fraudulently in giving the check to Carter. At the time Barclay gave the check to Carter, he had arranged for funds to cover the check. Further, there is in the record an admission by Carter that he and Barclay intended to go to the bank together on Monday, May 11, 1970, to cash Barclay's check. After learning of the non-payment of the check, on that very evening Barclay went to Carter's home and offered to go with him to the bank the next morning and see that the check was paid. The next day, he delivered the note to the bank, and deposited a sum sufficient to pay the check and had the banker call Carter's residence to advise him that the deposit had been made. After Carter's effort to renegotiate the transaction, Barclay attempted to deliver a cashier's check to Carter's attorney, but the attorney advised Barclay that he (the attorney) had no authority to accept the payment. On July 24, 1970, Barclay tendered in cash the full amount of the check which Carter refused. The testimony shows no injury to Carter. The record indicates that Carter did not desire to convey the land to Barclay, and, after the check was not honored when first presented, although the above described efforts were made by Barclay to pay for the land, Carter never again presented the check for payment. It is our opinion that the evidence does not show injury to Carter or any basis for rescission of the deed. We, therefore, overrule appellant's first point.

In defendant's fifth point of error, Carter complains of the court's exclusion from evidence of the contract of sale entered into by the parties on April 23, 1970, on the theory that all rights thereunder had merged under the deed. Although the question was raised as to the sufficiency of the appellee's briefing of this point, after considering the brief and record as a whole, along with the supplemental brief submitted, we have determined to consider the point.

The April contract between Carter and Barclay provided, in part, as follows:

"The Seller agrees, when the title objections have been cured, to deliver a good and sufficient general warranty deed properly conveying such property to said Purchaser, and *Purchaser agrees, when said deed is presented, to pay the balance of the cash payment. When the closing instruments are signed, executed and delivered they shall be cumulative rights of this contract and shall not merge the rights therein*." (Emphasis added)

It is Carter's contention that the above quoted language in the contract prevented the rights of the parties from merging into the deed when the deed was executed and delivered to Barclay, and that the contract and deed were cumulative of the rights of the parties, thereby entitling Carter to the remedy of rescission when payment of Barclay's check was refused. The deed executed on May 8, 1970, subsequent to the above-mentioned contract, recited a payment of $3,032.50 "to me in hand paid by Donald R. Barclay" and recited an unconditional conveyance of the property described without retention of lien of any kind. We have previously reviewed the acts and conduct of Barclay, and it is apparent that the evidence was insufficient to establish fraud on his part in the transaction through which he acquired the deed. Under these circumstances, in the absence of fraud, accident or mistake in the execution, the deed, an absolute conveyance on its face, must be considered the final ex-

pression and the sole repository of the terms upon which they have agreed with respect to the property conveyed, the consideration and the method of payment. Scull v. Davis, 434 S.W.2d 391 (Tex.Civ. App.—El Paso 1968, writ ref'd n. r. e.). Although, as contended by appellant, certain rights of appellee are still governed under the contract, such as the furnishing of water, restrictions and easements, it is our opinion that in this case the matter of consideration and method of payment were finalized in the deed which was an absolute conveyance of the property in question. Since the seller retained no express lien, in the event the purchaser fails to pay the stipulated purchase price, the grantor may sue for the debt but he cannot rescind the sale and recover the property. 59 Tex.Jur.2d, Vendor and Purchaser, § 484, at 32. For the reasons above stated we overrule appellant's fifth point of error. By reason of our holding herein that the general warranty deed by its very nature has finalized and supercedes any other agreement between the parties regarding consideration and method of payment, and, in the absence of fraud constituting any basis for rescission, we hold there is evidence of probative force to support the trial court's judgment quieting title in Barclay. We, therefore, overrule appellant's second point contending there is no evidence to sustain the trial court's judgment placing title in Barclay.

Appellant's second group of points of error, points three, four and nine, relates primarily to his attack of the court's finding that (1) Barclay had made a lawful tender of the purchase price; (2) Barclay is ready, willing and able to pay such amount; and (3) the court's failure to provide an adequate protective order to insure payment of the purchase price.

In appellant's third point of error, he attacks the trial court's finding that plaintiff Barclay made a lawful tender of the purchase price of $3,032.50 to Carter. Carter's contention is that unless a "lawful tender of the purchase price" was made by Barclay, he (Carter) is entitled to rescind the warranty deed executed and delivered to Barclay.

The property in question was conveyed to Barclay by a general warranty deed which recites the payment of cash consideration. No express lien having been retained, the appellant-vendor may sue for the debt and foreclose on an implied lien, but he may not rescind as in the case of an express vendor's lien. Huddle v. Cleveland, 297 S.W.2d 737, 740 (Tex. Civ.App.—San Antonio 1956, writ ref'd n. r. e.); 59 Tex.Jur.2d, Vendor and Purchaser, § 484. Therefore, even assuming that a "lawful tender" was not made, Carter was not entitled to a rescission, and even assuming that Carter had a right of rescission for failure to pay the consideration, Barclay's offer to pay the consideration would defeat such a right. Harding v. Garcia, 17 S.W.2d 859, 860 (Tex.Civ.App. —San Antonio 1929, no writ); 10 Tex. Jur.2d, Cancellation of Instruments, § 40, at 366. The record supports the trial court's finding that plaintiff Barclay is ready, willing and able to pay off the entire debt, and under the authorities above cited, payment of the debt is all that defendant Carter is entitled to demand. We overrule this point.

Appellant's points four and nine, relating to the trial court's failure to enter a "protective order" to insure the payment of the purchase price for the land conveyed shall be discussed in a subsequent portion of this opinion.

Appellant's third group of points of error, six, seven, eight and ten, relate primarily to appellant's claims of "no evidence" and "against the great weight and preponderance of the evidence" in regard to the jury's findings of actual and exemplary damages, and complaints regarding the trial court's instructions to the jury in connection with its consideration of punitive or exemplary damages.

Appellee asserts that the "no evidence" point regarding the jury's findings of ac-

tual and exemplary damages (point seven) cannot be considered by this court because of appellant's failure to follow certain procedural requirements for presenting the point. After reviewing the record, although the matter as to whether the point is properly before the court is not free from doubt, we have determined to consider the appellant's "no evidence" contention.

■ In his sixth and seventh points of error, appellant complains of the jury's findings, in answers to special issues that (1) $55 would reasonably compensate Barclay for damages by reason of appellant's entry upon and plowing the land; (2) such entry was prompted by malice; and (3) Barclay was entitled to $1,500 in exemplary damages. Appellant asserts there is no evidence to support such findings, and alternatively, such findings are against the great weight and preponderance of the evidence. There was ample evidence that Carter, from the time he began negotiations with the Barclays for the purchase of the land until the filing of this suit, was never satisfied with the terms of the contract whereunder he was required to convey the 6 acre tract to Barclay. The record shows that when Carter discovered that the check was not honored by the bank on the Monday morning following the Friday's "closing" of the transaction, he made no further effort to present the check to the bank for payment. After Barclay and Carter failed to make connections on the designated Monday morning for the planned trips for recording the instruments and payment of the checks, there was evidence to justify the jury's believing that Barclay's further efforts to carry out his part of the bargain were futile because of Carter's attitude and effort demonstrated by words and actions, to defeat the sale and conveyance. Despite Barclay's continued attempts to pay his debt and despite the controversy over the land, Carter entered upon the land within two to four weeks after the closing date in May, re-

moved Barclay's fence and plowed up the pasture in utter disregard of the fact that Barclay was in possession and of his rights outstanding under the general warranty deed, which, under these circumstances, gave Carter only the right to sue for the amount of the consideration. See 59 Tex. Jur.2d, § 484, at 32, supra; and Huddle v. Cleveland, supra. Also, when appellee tried to pay appellant, appellant sought to renegotiate and add additional terms to the contract. From all of the circumstances surrounding Carter's conduct toward and transactions with Barclay, including the trespass upon the land evidenced by the entry, removal of the fence and plowing of the land, the jury could have reasonably concluded that appellant was prompted by malice at the time of entry upon the land.

■ As to the $55 award for actual damages, we find Barclay's testimony sufficient to sustain the award. Barclay testified that due to Carter's action in taking down his fence, he would be forced to put the fence back up again. Although he admitted that he had not yet been put to any monetary expense due to the displacement of the fence, Barclay said he thought putting the fence back up again himself would take one full day and would be worth $50–$75, based on his experience in farming and working on fences. Thus, we think the jury was entitled to infer from his testimony that it was Barclay's opinion that his time and labor for one full day was of a value estimated at $50–$75. Of course, his opinion as to the value of his own time and labor was necessarily an estimate, but it is nonetheless competent proof. See Vol. 2, McCormick & Ray, Texas Law of Evidence, 2d ed., 1956, § 1422, at 256–257. Further, appellant's counsel elicited from Barclay that he could have hired men to do the job for $50–$75.[1] And a proper measure of damages for a temporary and reparable injury to realty is the cost of restoring the land to its condition immediately preceding the injury. 17 Tex.Jur.2d,

---

1. "Q. * * * you could have hired it done for $50 to $75.00?

"A. Yeah, I'm sure you could have."

Damages, § 69, at 145–6. Further, Barclay testified that he lost future pasturage on the land valued at $150. Having concluded that there is some evidence of probative force to sustain the jury findings as to actual damages and malice, we overrule defendant's no evidence point as to these two issues. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609, 613 (1950). Further, weighing the evidence supporting the verdict along with the other evidence in the case, including that which is contrary to the verdict, we conclude that the jury verdict as to the issues of malice and actual damages are not against the great weight and preponderance of the evidence, and we overrule this point as to the same two issues. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

As to the award by the jury of exemplary damages, we have upheld the jury finding of malice on behalf of defendant Carter in his entry into the property involved and the finding of $55 actual damages. We deem it proper to consider the matter of reasonableness of the exemplary damage award, giving due consideration to the overall setting and circumstances. The amount of the award is a matter resting largely in the discretion of the jury, and the basic rule has been said to be measurement by a rule of just punishment of the offending party, as opposed to fair compensation to the injured party. 17 Tex. Jur.2d, Damages, § 186, at 255.

Although the amount of exemplary damages must be reasonably proportional to actual damages, no set ratio may be set, as such ratio must depend on the state of facts in a given case. Southwestern Investment Company v. Neeley, 452 S. W.2d 705, 707 (Tex.Sup.1970); Cain v. Fontana, 423 S.W.2d 134 (Tex.Civ.App.— San Antonio 1967, writ ref'd n. r. e.); Lubbock Bail Bond v. Joshua, 416 S.W.2d 523 (Tex.Civ.App.—Amarillo 1967, no writ). Guidelines in determining whether the exemplary damages are excessive include the degree of outrage produced by the evil, the frequency of the evil, and the size of an award needed to deter similar wrongs in the future. Southwestern Investment Company v. Neeley, supra. Fees paid attorneys, time expended, and inconvenience may also be considered in fixing the amount of exemplary damages. Fitz v. Toungate, 419 S.W.2d 708 (Tex.Civ.App. —Austin 1967, writ ref'd n. r. e.); Pan American Petroleum Corporation v. Hardy, 370 S.W.2d 904 (Tex.Civ.App.—Waco 1963, writ ref'd n. r. e.).

After a careful review of the facts of this particular case, summarized above, we are of the opinion that the award of $1,500.00 exemplary damages is excessive by the sum of $750.00. Therefore, under Rule 440, Texas Rules of Civil Procedure, this court is under a duty to reverse and remand this case unless appellee files a remittitur of $750.00 within 10 days from the date of this opinion.

In appellant's eighth point he complains of the failure of the trial court to submit certain explanatory instructions with regard to the special issues concerning defendant Carter's entry upon the property, malice, and exemplary damages. This point is without merit, since the appellant did not object in writing to the court's charge prior to the time it was presented to the jury. All objections to the court's charge are required to be presented to the court in writing before the charge is read to the jury and "all objections not so made and presented shall be considered as waived." Rule 272, Texas Rules of Civil Procedure. Also, this rule is applicable to instructions as to elements of damages. Safeway Stores, Inc. v. Bozeman, 394 S.W.2d 532 (Tex.Civ.App. —Tyler 1965, writ ref'd n. r. e.); Kroger Food Co. v. Singletary, 438 S.W.2d 621 (Tex.Civ.App.—Beaumont 1969, no writ). In view of the foregoing, we overrule appellant's eighth point.

By his tenth point appellant contends that the trial court erred in awarding

exemplary damages when a "judicial admission" was made by Don Barclay that he suffered no actual monetary damages. This point is without merit and is overruled for the reasons discussed with regard to points six and seven above. It is obvious that the fact that Barclay could do the work of replacing the fence himself should not prevent his being entitled to compensation for the reasonable value of the work he would be required to perform to restore the fence to its former condition or by reason of being deprived of the pasturage because of the plowing.

In appellant's points of error four and nine he maintains that the trial court was in error in failing to enter a "protective order" to insure payment by appellee of the sum due the appellant. An examination of the judgment entered by the trial court discloses that no specific provision was made therein for the appellee's payment of the purchase price for the property in the sum of $3,032.50, which the court found had been lawfully tendered but not accepted by appellant. A consideration of the pleadings as a whole, particularly the appellee's pleadings, the findings in the court's judgment, all indicating an offer, willingness and ability of the appellee to pay the purchase price, there was no manifestation of any intent other than that the purchase price should be paid. We also note that appellee, in his brief and during oral argument, has advised this court of his present willingness and agreement to pay the amount of the purchase price into the registry of the trial court. When the pleadings as a whole are considered, including the pleadings of the appellee, as we are authorized to do, we have concluded that the pleadings as a whole embody sufficient factual allegations to authorize the court's ordering of the payment of the sum of the purchase price into the registry of the trial court. 45 Tex.Jur.2d, Pleading, § 168, at 714; Gossett v. Green, 137 Tex. 50, 152 S.W.2d 733 (1941). Also, by reason of the appellee's manifested willingness and agreement to pay such sum into the registry of the court, and in view of the court's findings and judgment, we deem it appropriate that the trial court should have provided for the immediate availability of the funds in the sum of $3,032.50, representing the purchase price of the land involved herein, thereby eliminating the possibility of any further action regarding the collection of the consideration for the conveyance of the property. The Court of Civil Appeals has the power to render the judgment which it deems should have been rendered by the trial court where it appears on the face of the record that modification in the judgment, should be made and justice of the case requires it. Rule 454, Texas Rules of Civil Procedure; Wofford v. Miller, 381 S.W.2d 640 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n. r. e.); Craft v. Hahn, 246 S. W.2d 897 (Tex.Civ.App.—Eastland 1952, writ ref'd n. r. e.). By reason of the findings of the previous valid tender of payment of such purchase price, no interest is allowable on the purchase price which is herein required to be deposited into the registry of the trial court. 55 Tex.Jur.2d, Tender, § 16, at 228. We, therefore, reform the judgment of the trial court to the extent of directing and ordering that within 10 days from the date of this opinion, the appellee shall deposit into the registry of the trial court the sum of $3,032.50, as the purchase price of the property involved, such sum to be paid by the clerk of the trial court to the appellant, in the event of final affirmance of this court's decision in this appeal and issuance of mandate in accordance with our holding herein; otherwise, such sum so deposited is to be returned to the party depositing the same in accordance with the provisions of law governing the disposition of such deposits so made into the registry of the court.

In the event the purchase price is timely deposited in the registry of the trial court and the remittitur suggested is timely filed as ordered herein, the judgment will be af-

firmed as reformed; otherwise, the cause will be reversed and remanded.

Reformed and affirmed on conditions of deposit of purchase price and remittitur.

JOY, J., not sitting.

### ADDENDUM TO OPINION

Appellee having timely deposited the purchase price into the registry of the trial court on February 2, 1972, and having timely filed on February 7, 1972, the remittitur, as ordered, the judgment of the trial court is accordingly reformed and affirmed.